UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                                            :
JUEL ROUNDTREE,                                             :
                                                            :        15cv8198
                    Plaintiff,                              :
                                                            :        OPINION & ORDER
          -against-                                         :
                                                            :
CITY OF NEW YORK, *et al.*,                                 :
                                                            :
                    Defendants.                             :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

WILLIAM H. PAULEY III, Senior United States District Judge:

          Defendants City of New York, et al., move to dismiss Plaintiff Juel Roundtree's

Amended Complaint for failure to state a claim under Rule 12(b)(6).  For the reasons that follow,

Defendants' motion is granted.

BACKGROUND

          Plaintiff pro se Juel Roundtree brings this federal civil rights action stemming

from his incarceration at the George R. Vierno Center on Rikers Island ("Rikers") from May

2015 to March 2016.  The Amended Complaint ("Complaint") is not a model of clarity.[1]  Rather,

---

[1]      Roundtree appears to have bolstered his Complaint with three other documents.  One such document, styled
"Exhibits to be Included" (ECF No. 46), was filed on the same day as the Complaint, and therefore will be
considered as part of the operative Complaint.  Another, titled "Amended Complaint Placed in the Mail" (ECF No.
49) was filed on this Court's docket on January 24, 2017, but dated as of December 23, 2016, the same date on
which the Complaint was filed.  Therefore, this Court incorporates ECF No. 49 into the Complaint.

          The third exhibit, called "Denial of Medical Treatment/Deliberate Lies by the Corrections Officer White
#10886 and Harassment" (ECF No. 51), is dated February 24, 2017.  This document was filed well past the amended
pleading deadline of February 3, 2017 (Scheduling Order, ECF No. 44), and therefore is construed by this Court as
an amendment to the Complaint.  While Federal Rule of Civil Procedure 15 provides that amendment shall be given
freely, when a scheduling order is already in place and sets a deadline for all amended pleadings, Rule 16(b)(4) only
allows for modification of such schedule "for good cause" and with this Court's consent.  After reviewing the
contents of ECF No. 51, this Court concludes that there is no good cause to modify the amended pleading deadline.
ECF No. 51 merely re-hashes a number of allegations already set forth in the Complaint, directs those allegations at
a corrections officer who is not a defendant in this action, and lacks any meaningful basis from which good cause
may be inferred.  Accordingly, for purposes of this motion, this Court will consider only the Complaint and the
pleadings entered as ECF Nos. 46 and 49.

Roundtree's prolix pleading is replete with wide-ranging allegations of misconduct and systemic

shortcomings at Rikers Island. At bottom, the Complaint consists of Fourteenth and Fourth

Amendment violations spanning a variety of topics, including dangerous prison buses, arbitrary

cell searches, inadequate medical care, spoiled food, lack of accommodations for disability,

unlawful video surveillance, and unauthorized use of voice biometrics, to name a few.

Roundtree seeks relief from three discrete groups of defendants: (1) Corizon Health Inc.

("Corizon") and "Dr. Cherchever," a physician at Corizon; (2) the New York City Department of

Correction ("DOC"), as well as Warden Augustus, Captain Ellis, Captain Conyers, and Officer

McQuiller, corrections officers at DOC; and (3) the City of New York. (Complaint, ECF No. 48

("Compl."), ¶¶ 10–16.) In analyzing the Complaint, this Court has grouped some of Roundtree's

many grievances into several categories. This Court liberally construes and presumes as true all

of the allegations in Roundtree's Complaint.

DISCUSSION

I.  Standard

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a

district court must review the facts alleged in the complaint, including any documents attached as

exhibits or incorporated by reference. Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999).

In doing so, the court "must accept all factual allegations in the complaint as true, and draw

inferences from those allegations in the light most favorable to the plaintiff. To survive a motion

to dismiss brought pursuant to Rule 12(b)(6), a complaint must allege enough facts to state a

claim that is plausible on its face." Chris H. v. N.Y., 2017 WL 6514690, at *2 (S.D.N.Y. Dec.

18, 2017) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"Where, as here, the complaint was filed pro se, it must be construed liberally to raise the strongest arguments it suggests. Nonetheless, a pro se complaint must state a plausible claim for relief." Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013) (alterations, citations, and internal quotation marks omitted).

## II.    Fourteenth Amendment Claims

Although Roundtree raises several constitutional violations, the assortment of conditions-of-confinement allegations in the Complaint essentially form the basis of a Fourteenth Amendment claim. "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. A pretrial detainee's claims are evaluated under the Due Process Cause because, pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). The Constitution requires prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Importantly, a pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

A pretrial detainee "may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." Darnell, 849 F.3d at 29. Thus, the plaintiff must satisfy two requirements to prove a claim—(1) an "objective" prong showing that the "challenged conditions

were sufficiently serious to constitute objective deprivations of the right to due process," and (2) a "subjective" prong, which is better classified as a "mens rea" prong showing that "the officer acted with at least deliberate indifference to the challenged conditions." Darnell, 849 F.3d at 29.

Under both the Eighth and Fourteenth Amendments, objective deprivation may be established if the plaintiff can show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." Darnell, 849 F.3d at 29. There is no static test to determine whether a deprivation is sufficiently serious. Rather, the "conditions themselves must be evaluated in light of contemporary standards of decency." Blissett v. Coughlin, 66 F.3d 551, 537 (2d Cir. 1995). Such conditions may be "aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise." Walker, 717 F.3d at 125.

Under the subjective prong, "a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment" exists if the pretrial detainee can prove that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate [a] risk" the defendant-official knew, or should have known. Darnell, 849 F.3d at 36. In other words, "the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively." Darnell, 849 F.3d at 36. This standard, however, does not mean that officials acting merely negligently will be held liable for constitutional violations. "[A]ny § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." Darnell, 849 F.3d at 36.

A.  Transportation

Roundtree complains that the buses transporting him to court were "filthy," "unsafe," and lacked "seatbelts, safety equip[ment], or emergency egress."  (Compl. ¶ 20.)

Prison officials must "take reasonable measures to guarantee the safety of inmates in their custody," including transportation.  Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996).  But the Second Circuit has expressly held that "the failure of prison officials to provide inmates with seatbelts does not, without more, violate the Eighth or Fourteenth Amendments."  Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012).  And "two other Courts of Appeals have held that a municipality's decision not to provide prisoners with seatbelts does not violate prisoners' federal rights" because legitimate penological concerns outweigh the countervailing safety risks.  Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 907 (8th Cir. 1999) ("[I]ndividuals transported in the wagon, even those who were handcuffed, could use the seatbelt as a weapon to harm an officer, other passengers being transported in the wagon, or even themselves."); Dexter v. Ford Motor Co., 92 F. App'x 637, 641 (10th Cir. 2004) ("[A] failure to seatbelt a prisoner does not, of itself, expose an inmate to risks of constitutional dimension.").

Here, Roundtree does not specify the injuries he suffered from riding prison buses.  He alleges in general terms that he was "thrown around, jostled, and banged . . . causing pain, anxiety, distress."  (Compl. ¶ 20.)  But while those experiences are "unpleasant, [they] do[] not necessarily equate to a constitutional violation."  Livigni v. Ortega, 2016 WL 6143351, at *2 (S.D.N.Y. Oct. 19, 2016); Hays v. City of N.Y., 2017 WL 782496, at *6 (S.D.N.Y. Feb. 28, 2017); Stevens v. City of N.Y., 2013 WL 81327, at *3 (S.D.N.Y. Jan. 8, 2013), aff'd, 541 F. App'x 111 (2d Cir. 2013).  Without alleging how the absence of seat belts, safety equipment, or emergency egress caused specific injuries, or that prison officials were aware of these conditions

yet remained deliberately indifferent to them, Roundtree's allegations fall short of mounting a valid claim.

      B. <u>Housing</u>

          i. <u>Exposure to Gang Violence</u>

Roundtree asserts that his safety was regularly jeopardized at Rikers. According to Roundtree, "slashings [at Rikers] occurred almost daily," with intra-gang fights arising in the intake and clinic areas that he frequently visited to receive medical care. (Compl. ¶ 21; <u>see also</u> Compl. ¶¶ 22–23.) But Roundtree does not allege that he was actually harmed by other inmates, or that the facility failed to protect him when intra-prison skirmishes arose. When "violence at the hands of other inmates" is alleged, the "injury suffered by the plaintiff must be sufficiently serious." <u>Wassmann v. Cty. of Ulster, N.Y.</u>, 528 F. App'x 105, 106 (2d Cir. 2013) (citing <u>Farmer</u>, 511 U.S. at 833 (1994)). And though Roundtree must also allege that the responsible officials "acted with deliberate indifference to inmate health or safety," the Complaint is devoid of any specific allegations demonstrating that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that] [they] . . . dr[ew] the inference." <u>Farmer</u>, 511 U.S. at 833; <u>see also</u> <u>Barreto v. Cty. of Suffolk</u>, 762 F. Supp. 2d 482, 492 (E.D.N.Y. 2010) (a constitutional violation plausibly alleged with facts that corrections officers "knew specifically" that certain inmates had a "record of previous attacks on inmates" and that they took "no action to segregate [plaintiff] from the general population" after being made aware of risk). The most that Roundtree alleges is that he was exposed to a general risk of injury. That alone is insufficient to state a claim.

ii.  Accommodation of a Disability

Roundtree complains about the "steel picnic style tables" in the housing areas, describing them as "small steel disks, that are too small, too low to the ground, and completely lack back support."  (Compl. ¶ 26; ECF No. 46, at 1.[2])  These seats "put pressure on the pelvis, buttocks, and spine, and since being forced to sit on them, [his] left hip [was] irreparabl[y] damaged, and spine [showed] shifting and misalignment."  (Compl. ¶ 26.)  Further, his steel bed, with "inadequate yoga style mats supplied as mattresses," exacerbated what he claims were pre-existing "knee pain, severe pain the groin, spine, and hips."  (Compl. ¶ 26 see also Compl. ¶ 17(c) ("agitation of pre-existing injures (already on record with D.O.C.)")  And though Roundtree requested more bedding and alternative seating in the housing areas, Roundtree says those requests went unanswered.

"Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim."  Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1999).  A claim of constitutionally inadequate bedding, which this Court construes to include seating, may be sustained where: (1) the plaintiff had a pre-existing medical condition requiring a special bed to protect against serious damage to his future health; (2) he made that medical condition known to prison officials; (3) he requested a special bed to accommodate such medical condition; and (4) his request was denied by an official who knew of and disregarded an excessive risk to the plaintiff's health or safety.  Boyd v. City of N.Y., 2012 WL 5914007, at *4 (S.D.N.Y. Sept. 18, 2012), report and recommendation adopted in relevant part, 2013 WL 452313 (S.D.N.Y. Feb. 6, 2013).  The "Second Circuit has held that the adequacy of a mattress may, alone or in combination with other factors, constitute a

---

[2]  Page citations to the ECF pleadings correlate to their PDF pagination.

condition that satisfies the objective prong of the conditions-of-confinement test if its inadequacy causes or threatens to cause sufficiently serious harm." <u>Harris v. Moore</u>, 2015 WL 10427865, at *3 (S.D.N.Y. Dec. 3, 2015).

Reading the Complaint in the light most favorable to the plaintiff, Roundtree has alleged that he had pre-existing physical conditions—knee, groin, spine, and hip pain—that were exacerbated by the lack of an adequate bed and mattress. He also developed new ailments, including "left hip damage" and "spine misalignment" caused by inadequate seating. Roundtree made these conditions known to the prison staff, explaining that his "inability to sleep, lay down, sit or stand for long without extreme pain and discomfort [went] completely ignored." (Compl. ¶ 26.) And though he made requests over several months for adequate bedding and seating to different officials within the prison system—including the disability rights coordinator— Defendants failed to act on them. (Compl. ¶ 26.)

Roundtree also has sufficiently alleged that a prison official acted with deliberate indifference knowing that "an inmate face[d] a substantial risk of serious harm and . . . disregard[ed] that risk by failing to take reasonable measures to abate the harm." <u>Hayes</u>, 84 F.3d at 620. Based on the Complaint's allegations, Defendants "were actually aware of both the plaintiff's condition and the potential risk of harm that would result if the plaintiff were denied access to the mattress" and more adequate seating. <u>Harris</u>, 2015 WL 10427865, at *4. Indeed, Roundtree's requests "for extra mats, pillows, chairs and/or to be moved somewhere without these dangerous beds or tables" were ignored. (Compl. ¶ 26.) In July 2015, he "grieved these matters and was [ ] referred to clinic, and tried to appeal with no result." (Compl. ¶ 26.) And for six months, he sent "requests and complaints to 'Disability [R]ights [C]oordinator,' and various agencies and parties, which were almost completely ignored. The coordinator completely

ignored all correspondences," leaving Roundtree to "languish [and] suffer[] with no redress." (Compl. ¶ 26.)

Roundtree finally received adequate seating after a "Dr. Rajan" answered his request for chairs, but he claims that corrections officers subsequently hid them. Since then, he claims that has had trouble re-acquiring the alternative seating. (ECF No. 46, at 7–8.) All of these incidents occurred after Defendants were put on notice of Roundtree's severe physical conditions through his repeated requests for accommodation. Based on their failure to respond, Roundtree suffered and/or exacerbated his injuries. "Due to the defendant's clear and persistent disregard for [Roundtree's] injury . . . it is reasonable to infer deliberate indifference towards [his] preexisting injury." Harris, 2015 WL 10427865, at *4.

Nevertheless, though Roundtree has pled just enough in substance, none of his allegations identify which individuals were responsible. While he makes reference to individual corrections officers for other violations in his Complaint (e.g., harassment, privacy violations), he does not specify who at Rikers refused to provide him with adequate bedding or seating. For example, Roundtree says that his requests for accommodation were ignored by the "disability rights coordinator," but without more, this Court cannot sustain his claim. Further, Roundtree elaborates on his ordeal in ECF No. 46, alleging that after Dr. Rajan helped get him alternative chairs but that unnamed corrections officers would "steal them and hide them, simply to be malicious." (ECF No. 46 at 9.) Accordingly, this Court dismisses Roundtree's claim for inadequate bedding and seating but grants him leave to re-plead this particular claim and specifically identify the responsible parties.

### iii.  Stairs and Elevators

Roundtree asserts that from February 2016 to March 2016, he was placed into housing area 15B and 15A, which were located six flights above ground.  (Compl. ¶ 31.)  Elsewhere in the Complaint, Roundtree says he was deprived of his cane and placed in a cell located on "the 2nd floor up a steep staircase" during an undefined period.  (Compl. ¶ 24.)  In each case, because of his physical limitations, he found it difficult to walk up and down the stairs.  He claims that these barriers precluded him from "going to the clinic and/or receiving his integral medications," and that Officer Conyers denied him use of the elevators as a means to further prevent his access to the clinic and law library.  (Compl. ¶¶ 31–33.)

Roundtree's allegations regarding the hardship occasioned by walking six flights of stairs in his condition are conclusory and fail to state a claim.  The Complaint provides no details about how he was injured or how his condition may have deteriorated.  Roundtree also makes no assertion that his cane was prescribed by his doctors or that it was medically necessary.  In any event, penological interests outweigh any medical necessity.  Tellingly, Roundtree concedes that another non-defendant officer told him that he could use the elevator if he "chose to be strapped to a gurney."  (ECF No. 46 at 6.)

The general damages Roundtree asserts—that he was "in such pain and emotional distress" that he "could not eat, sleep, or prepare for hearings, and trial"—fall woefully short of establishing a substantive due process violation.  See Carbonell v. Goord, 2000 WL 760751, at *8 (S.D.N.Y. June 13, 2000) (plaintiff "informed C.O. Simon of the risk of his going down the stairs on crutches, and that C.O. Simon's response was one of impatience and aggression."); Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987) (guard forced inmate to use ladder knowing it was unsafe to do so).

iv.  Officer Harassment, Chemical Sprays, and Torture

Roundtree asserts he was placed in "a housing unit (9B) that was one of the worst in the [building]" where there was a "known practice of vengeful retaliatory searches and attacks by correction staff, for acts committed by prior detainees who were already gone."  (Compl. ¶¶ 22–23.)  Specifically, corrections officers Danzig, McQuiller, and Conyers routinely ridiculed and harassed Roundtree, filed false reports against him, and prevented him from receiving medical care.  (Compl. ¶¶ 35, 92.)  The corrections officers routinely destroyed his property, confiscated his personal effects, and made life generally miserable for him.  (Compl. ¶ 92.)  Roundtree further contends that Defendants tortured him by turning off his cell lights for prolonged periods of time, banning the use of watches, and tampering with clocks, all for the purpose of depriving him of use of his sensory abilities.  (Compl. ¶ 91.)  Finally, Roundtree takes issue with the quality of Rikers food, claiming that on one occasion, he got so sick that he started vomiting "projectile sprays" and had "blood in his stool."  (Compl. ¶ 30.)  This Court addresses each category of misconduct in turn.

1.  Verbal Harassment

Roundtree's allegations regarding ridicule and verbal harassment are insufficient to state a claim.  Roundtree asserts that Defendants "have taken direct action to ridicule [him]," singled him out in cell searches and confiscations, "glare[d] at [him], and provoke[d] him, in an attempt to cause a confrontation," leading him to file "100s of complaints against [one of the Defendants] for stealing, harassment, and various [other] violations of people's rights incarcerated here in [Rikers]."  (Compl. ¶ 35, 92.)  Courts have consistently held that "the mere allegation of verbal abuse, however repugnant it may be, does not rise to the level of a constitutional violation and is not cognizable under" § 1983.  Banks v. Cty. of Westchester, 168

F. Supp. 3d 682, 691 (S.D.N.Y. 2016); <u>Webster v. Fischer</u>, 694 F. Supp. 2d 163, 187 (N.D.N.Y.

2000); <u>Zimmerman v. Seyfert</u>, 2007 WL 2080517, at *28 (N.D.N.Y. July 19, 2007) ("Inmates

have no constitutional right to be free from harassment" unless it rises to level of denying the

inmate "minimal civilized measure of life's necessities.").

2. <u>Interference with Medical Care</u>

Roundtree asserts that Officers Danzig, McQuiller, and Conyers "preclude[d] him

from going to appointments, receiving medical care, or procuring necessary medical equipment,

required for his healing, and maintaining his health, and well-being." (Compl. ¶ 35.)  He also

alleges that Officer Danzig lied to others that Roundtree "was refusing medical appointments,

did not wish to see doctors, or get his medication over 30 different occasions," because she

wanted to avoid working.  (Compl. ¶ 35.)

These allegations are emblematic of the Complaint's general, conclusory

statements.  Roundtree may have been prevented from going to doctors' appointments or from

receiving medical treatment, but he does not provide specific details.  It is difficult for this Court

to understand which doctor he was deprived of seeing, what kind of medication or medical

equipment he needed, how being deprived of those things caused an injury, and what the specific

injury was.  Although "[n]on-medical personnel may engage in deliberate indifference if they

intentionally deny or delay access to medical care, <u>Jean v. Barber</u>, 2011 WL 2975218, at *5

(N.D.N.Y. July 21, 2011), a plaintiff must "prove that [nonmedical] prison personnel

intentionally delayed access to medical care when the inmate was in extreme pain and has made

his medical problems known to the attendant prison personnel or that the inmate suffered a

complete denial of medical treatment." <u>Hodge v. Coughlin</u>, 1994 WL 519902, at *11 (S.D.N.Y.

Sept. 22, 1994).  Here, some of the Complaint's allegations belie the contention that Roundtree

could not make it to appointments or receive adequate treatment—he did in fact see doctors and received treatment at clinics on other occasions. (See Compl. ¶¶ 19, 25, 34.) And though Roundtree paints a narrative in which he was routinely denied medication, he does not specify any adverse consequences to his health. Accordingly, this branch of Roundtree's Complaint is dismissed.

### 3. False Statements and Reports

Roundtree claims that Defendants "intentionally and deliberately with malice, gave false statements, and/or falsified public records, as well as, failed to file accurate or corrective statements, or failed to report the defendants who engaged in the misconduct." (Compl. ¶ 37.) "The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986); Jackson v. Johnson, 1990 WL 170412, at *4 (S.D.N.Y. Oct. 26, 1990) ("[P]laintiff's allegation concerning the falsification of the report fails to state a claim since, even assuming that the report was falsified, it does not appear that this caused plaintiff any harm let alone the deprivation of a constitutional right."). Indeed, Roundtree can only maintain an actionable claim against corrections officers for filing a false report if he "was disciplined without adequate due process as a result of the report" or the report "was issued in retaliation for exercising a constitutionally protected right." Richard v. Fischer, 38 F. Supp. 3d 340, 362 (W.D.N.Y. 2014). Roundtree alleges nothing of the sort because the Complaint is devoid of facts suggesting that he was wrongfully disciplined or that he was retaliated against for attempting to protect his constitutional rights.

4.   Use of Chemical Sprays

Roundtree alleges that he was "exposed to chemical spray of others over 20 times, in which, [the] spray went directly in his mouth and eyes, but was never offered treatment (including 4/6/16), and even though officers were taken out on stretchers etc., no care whatsoever was given to detainees or plaintiff, he was merely locked in cell, and ignored for hours, and sometimes locked in for 12 or more hours, up until days."  (Compl. ¶ 93.)  According to Roundtree, corrections officers are "paid for spraying detainees and brag about earning $140 to use chemical weapons on detainees."  (Compl. ¶ 93.)  Additionally, Roundtree was the victim of collateral sprays—that is, he was incidentally sprayed when the prison official sprayed another inmate.  Roundtree claims that the use of chemical sprays were arbitrary, and even worse, that officials would not permit him and others to de-contaminate themselves afterward.  (ECF No. 49 at 3–4.)

For excessive force claims brought under the Due Process Clause of the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015).  Roundtree has pled enough facts to show that the excessive force was sufficiently serious and that the corrections officers acted intentionally or recklessly failed to act with reasonable care.  Though he does not expressly allege it, the Complaint says enough for this Court to infer that Roundtree had done nothing to warrant the use of a chemical spray.  In some instances, he was an innocent bystander.  See Velez v. McDonald, 2011 WL 1215442, at *4 (D. Conn. Mar. 27, 2011) ("[I]t can readily be inferred from his allegations that the amount of force used by Defendants far exceeded the need for that force, particularly in the absence of any defined threat or any attempt to temper the severity of Defendants' treatment of Velez.").

Moreover, the allegations suggest that certain corrections officers engaged in this activity for sport, paying each other on occasion, and refusing to allow prisoners to de-contaminate themselves or receive medical treatment for injuries sustained from the sprays.  (ECF No. 49 at 4.)  Roundtree specifically alleges that certain excessive force incidents were captured on camera during specific time periods.  This allegation is particularly helpful since discovery of any relevant footage will bear on the success of that claim.

As with Roundtree's bedding and seating allegations, however, this claim fails because Roundtree has not specified the culpable individuals.  (See Compl. ¶ 92, ECF No. 49 at 2.)  Roundtree seems to attribute the misconduct to a widespread, systemic problem within the Department of Corrections, but because "vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Radin v. Tun, 2015 WL 4645255, at *8 (E.D.N.Y. Aug. 4, 2015).  This Court simply cannot speculate as to how each prison official or corrections officer participated in injuring Roundtree.  Accordingly, Defendants' motion to dismiss is granted without prejudice, with leave for Roundtree to re-plead this specific claim and name specific defendants.

## 5.  Torture Claims

The claims pertaining to torture have no merit.  "The allegations pertaining to Roundtree's cell lights and clock placement throughout the facility fall woefully short of the type of "unquestioned and serious deprivations of basic human needs," or deprivation of "the minimal civilized measure of life's necessities."  Davidson v. Murray, 371 F. Supp. 2d 361, 370 (N.D.N.Y. 2005); Blyden, 186 F.3d at 263 ("Because society does not expect or intend prison

conditions to be uncomfortable, only extreme deprivations are sufficient to sustain a conditions of confinement claim.").

         v.  Food Quality

The Complaint's general allegations about food quality, preparation, and service fail to state a valid claim. Roundtree offers one specific incident in which his consumption of spoiled chicken caused him to vomit "projectile sprays and [find] blood in his stool." (Compl. ¶ 30.) Despite informing a corrections officer of his food poisoning, Roundtree says he was "left in his cell in a pool of vomit until the following day." (Compl. ¶ 30.)

Prison officials are required to serve "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983). But the quality and preparation of the food must fall so short of basic standards that they pose an unreasonable risk of serious damage to Roundtree's health. See, e.g., White v. Olivar, 2012 WL 2878641, at *2 (S.D.N.Y. July 12, 2012) (food contaminated with human hair and avian fecal matter could have posed substantial threat to plaintiff's health); Gray v. Metro. Detention Ctr., 2011 WL 2847430, at *10 (E.D.N.Y. July 15, 2011) (meal containing glass caused lacerations to plaintiff's gums and mouth).

The Complaint fails to specify how preparation of food deviated from the standard course, or whether the food contained any unusual ingredients that would have posed a serious threat to Roundtree's health. As best this Court can determine, Roundtree's only specific claim is an unexceptional case of food poisoning, a condition to which even non-prisoners are susceptible. But a single incident of contaminated food does not rise to the level of a substantive due process violation. See Rieco v. Moran, 2015 WL 1898140, at *1 (W.D. Pa. Apr. 24, 2015),

aff'd, 633 F. App'x 76 (3d Cir. 2015); Lohman v. King Cty. Jail, 2014 WL 4187150, at *3 (W.D. Wash. July 1, 2014) ("[N]either isolated instances of food poisoning, temporary lapses in sanitation, nor occasional service of meals contaminated with foreign objects are sufficiently serious to rise to the level of a constitutional violation.").

Moreover, Roundtree's claim that he was denied proper medical attention fails on both an objective and subjective level. The sole incident of food poisoning did not pose an immediate danger to Roundtree's health, especially when contrasted against other cases in which courts have found serious violations pertaining to spoiled food. See Olivar, 2012 WL 2878641, at *2; Gray, 2011 WL 2847430, at *10. And though the Complaint alleges that Roundtree was sick and left alone in his cell until the next day, that allegation alone does not rise to the level of "criminal recklessness" or conduct amounting to something "more than ordinary lack of due care for the prisoner's interest or safety." Hudson v. City of N.Y., 2016 WL 3976399, at *6 (S.D.N.Y. June 23, 2016). Accordingly, this component of Roundtree's Complaint is dismissed.

C. Medical Care

i. Deprivation of Medical Diagnosis and Treatment at Corizon

1. Medical

Roundtree's complaint alleges a broad spectrum of misconduct pertaining to his medical conditions, ranging from improper diagnosis, inadequate treatment, and undue delays in providing medical services and scheduling appointments. Roundtree's medical care and treatment allegations are salted throughout the Complaint, making it difficult to determine with greater precision what types of injuries he suffered, and the type of medical treatment he should have received.

To start, he alleges that in May 2015 until the present, Defendants—including Corizon Medical and Dr. Cherchever—deprived him of adequate pain management, but he does not specify the various ailments precipitating the need for such treatment. (Compl. ¶ 19.) He next asserts that after having his wife "call 3-1-1, to be produced to sick-call," he met with Dr. Cherchever, who "denied his knowledge of [his] medical condition, [even] though [he] saw it on the screen. After [he] notified [Dr. Cherchever], that he not only saw screen, but that his MRIs and x-rays were on file from Doshi Diagnostic and Lenox Hospital since 2013, [Cherchever] turned off computer and ended the visit abruptly." (Compl. ¶ 25.) This allegation is virtually incomprehensible. It is also not moored to a medical condition or incident, leaving this Court unable to discern what Dr. Cherchever had specifically refused to do and whether that refusal caused Roundtree any injuries.

Roundtree provides slightly more clarity later in the Complaint with regard to his orthopedic problems. He alleges that he was "scheduled for orthopedic visits at 'west facility,' and Bellevue hosp[ital], but was given super low priority in total disregard for the pain and suffering he was experiencing." (Compl. ¶ 27.) Roundtree further asserts that in a "subsequent visit to 'West Facility,' an older (white-male) orthopedist, informed [him that] he needed to sit higher and wear knee braces, but he could not prescribe either as per a D.O.C. security policy." (Compl. ¶ 28.) After Roundtree requested knee and back braces, he claims that Defendants refused his request, leaving him susceptible to being "crippled for life." (Compl. ¶ 28.) In March 2016, Roundtree was "finally afforded [an] appt. with orthopedic Dr. at 'Bellevue Hosp.,' but Rikers put his appt. at such low priority he wasn't seen until 3, and 12 months later, even though it was known if condition was left untreated he might never walk normally again." (Compl. ¶ 34.)

Crediting these allegations as true, Roundtree's claim still fails. The Complaint does not clearly set forth his specific medical conditions, how the delay in getting him to an orthopedist caused his unspecified injuries, or how the prison's refusal to grant his request for knee or back braces (the latter of which was not recommended by Roundtree's orthopedist) contributed to an injury beyond the theoretical possibility that he might be crippled for life. Moreover, Roundtree insinuates that Defendants' denied his requests for medical equipment because of security concerns. (Compl. ¶ 34.) But that is a legitimate, penological reason to deny the use of medical equipment absent an urgent, countervailing medical need. Rahman v. Artuz, 1999 WL 600520, at *4 (S.D.N.Y. Aug. 10, 1999) ("There was a legitimate penological reason for not giving [plaintiff] his braces in the SHU.").

None of the allegations in the Complaint establish a compelling medical need; they merely state that the orthopedist expressed a sentiment that Roundtree should sit higher and wear a knee brace. Moreover, Roundtree does not allege that he suffered an actual injury because of his inability to obtain braces. Rahman, 1999 WL 600520, at *3 ("Nor has plaintiff shown that deprivation of the braces caused extreme pain or degeneration of the condition of his knees."). The Complaint does not even assert that Roundtree suffered an injury substantially less severe in nature. Martinez v. Aycock-West, 164 F. Supp. 3d 502, 512 (S.D.N.Y. 2016) ("Plaintiff does not allege otherwise or that he suffered any permanent harm."). He merely states that he could have been crippled, but the alleged conditions he faced were not sufficiently serious enough to have posed a serious risk to his health.

Similarly, Roundtree furnishes a subset of medical care related allegations in the Complaint Exhibit, alleging general systemic problems about the medical clinic's approach to patient care. He casts general aspersions on the clinic staff, saying that they "seem not willing to

work, and have 2 or 3 patients waiting up to 5 hours to be seen," and when they are finally seen, the clinicians "only want to address 2 issues or less." (ECF No. 46 at 15.) These allegations have nothing to do with Roundtree.

Finally, Roundtree takes aim at two individual physicians—Dr. Alan and Dr. San Jose—who allegedly wrote false reports and changed or refused Roundtree's medication, but these bare assertions fall short of stating a claim. One-sentence accusations against each doctor are insufficient to state a claim against either of them or establish liability against any of the entity defendants.

### 2. Dental Care

Roundtree separately alleges that in June 2015, he requested a dental visit "due to extreme pain," which went ignored until March 2016. (Compl. ¶ 29.) This allegation fails, however, because Roundtree has not alleged that he suffered any injuries resulting from the delay.

Further, Roundtree asserts that he had "2 wisdom teeth cutting into [his] cheek, a growth on [his] foot, and variety of other problems." (ECF No. 46 at 15.) Roundtree's allegations regarding his wisdom teeth meet the objective standard. At this stage, this Court must "assume that the pain that [Roundtree] suffered as a result of the delay in the provision of medication [or medical services] was sufficiently severe to . . . cause[] him needless pain and suffering." Palms v. Quisling, 2007 WL 5404586, at *4 (W.D. Wisc. Jan. 12, 2007).

But Roundtree cannot meet the subjective standard—that Defendants intentionally put him at a substantial risk of serious harm or that they were deliberately indifferent to that risk. Roundtree asserts that his requests for wisdom teeth treatment were ignored even after he made "over 20 complaints (3 today)" as of November 2015 (ECF No. 46 at 15), but that sole allegation

does not suffice to make out deliberate indifference.  "While dental pain and toothaches can be excruciatingly painful and proper dental care is an important part of overall health, short, intermittent delays in appointment times, absent any indication of serious infection or aggravation of the condition" cannot sustain a violation of due process rights.  Fuller v. Hohensee, 2008 WL 4826261, at *11 (W.D.N.Y. 2008).  Moreover, even if a defendant complains, delays in treatment do not rise to the level of deliberate indifference that is objectively unreasonable.  Roundtree has not alleged an "outright refusal of any treatment for a degenerative condition that [ ] cause[d] acute infection and pain if left untreated and [ ] imposition of a seriously unreasonable condition on such treatment."  Harrison v. Barkley, 219 F.3d 132, 138 (2d Cir. 2000) (emphasis original).  While Roundtree may have complained repeatedly about his wisdom teeth, the Complaint fails to allege that Defendants expressly refused to treat him and that his requests for treatment were rejected for an invalid reason or to punish him.

ii.   Deprivation of Medical Care by Prison Staff

Finally, Roundtree makes an assortment of allegations regarding access to medical treatment.  There are wide-ranging complaints about how the corrections officers would delay his appointments and impede his ability to obtain medical treatment.  In a situation where "treatment is delayed, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone to determine whether the plaintiff has stated a claim for deliberate indifference to his medical needs."  Cuffee v. City of N.Y., 2017 WL 1232737, at *9 (S.D.N.Y. Mar. 3, 2017) (emphasis original).  The type of injuries resulting from delays in delivery of adequate medical care can range depending on how long that care is withheld.  A "life-threatening and fast-degenerating condition for three days"

may constitute deliberate indifference while "delayed major surgery for over two years" may also achieve the same. DeMeo v. Koenigsmann, 2015 WL 1283660, at *11 (S.D.N.Y. Mar. 20, 2015). Nevertheless, the pain that a plaintiff suffers from being deprived of medical care must be "evidently so extreme that" it leaves the plaintiff "in such a state [of pain], even for a short time, [and] presents a denial of the minimal civilized measure of life's necessities." Cuffee, 2017 WL 1232737, at *9.

      The Complaint states that Officers Conyers, Danzig, and McQuiller precluded Roundtree "from going to appointments, receiving medical care, or procuring medical equipt., required for his healing, and maintaining health, and well-being." (Compl. ¶ 35.) Officer Danzig also apparently answered the phone and said that Roundtree "was refusing medical appointments, did not wish to see doctors, or get his medication" on "30 different occasions." (Compl. ¶ 35.) The other allegations strewn about the Complaint are as general and conclusory as those in Paragraph 35. Fatal to Roundtree's claim is that these allegations fail to specify how long he was deprived of treatment, and whether he faced a serious risk of harm. Like his medical care allegations against Corizon and Dr. Cherchever, Roundtree also fails to specify the medical conditions that worsened as a result of his inability to access medical care. Smith v. City of N.Y., 2016 WL 7471334, at *4 (S.D.N.Y. Dec. 28, 2016) (claim is insufficient if "delay in providing medical attention is neither the underlying cause of a plaintiff's condition nor contributed to worsening in the condition"). They merely reflect his frustration with the corrections officers' refusal to help him or to facilitate his receipt of medical care. And while medical care is necessary to maintain general health, healing, and well-being, the type of care that he was prevented from accessing was not tantamount to causing serious damage to his health. Darnell, 849 F.3d at 29.

III.    Fourth Amendment Claims

The "Fourth Amendment protects individual privacy against certain kinds of governmental intrusion . . . and it is well-established that its protections extend to prisoners." Holland v. City of N.Y., 197 F. Supp. 3d 529, 542 (S.D.N.Y. 2016).  The Fourth Amendment prohibits only unreasonable searches.  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application" and each case "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  Bell v. Wolfish, 441 U.S. 520, 558 (1979).  "Courts must consider the scope of the particular intrusion, the manner in which the search is conducted, the justification for initiating it, and the place in which it is conducted."  Green v. Martin, 224 F. Supp. 3d 154, 163 (D. Conn. 2016).

A.  Cell Search

The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."  Hudson v. Palmer, 468 U.S. 517, 526 (1984).  In analyzing the claims of a pretrial detainee, if a search is conducted by a prison official, "established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether the security needs could justify it."  United States v. Cohen, 796 F.2d 20, 24 (2d Cir. 1988).  Accordingly, Roundtree's allegations that he was subject to "as many as 19 searches of the same housing area" in the span of a few days does not state a claim under the Fourth Amendment.  Corley v. City of N.Y., 2017 WL 4357662, at *15 (S.D.N.Y. Sept. 28, 2017).

Nevertheless, Roundtree attempts to bolster his claim with specific allegations against Defendant Conyers: "Capt. Conyers has not only held [Roundtree] in the housing unit during searches to make sure she can harass [him]," but she also "told C.O.'s to destroy [his] medications, to confiscate [his] bibles, destroy [his] sketches, and legal work . . . has had them steal commissary food . . . [and] toss [his] cell." (Compl. ¶ 35.) The destruction of property in connection with a cell search is more appropriately assessed under the Fourteenth Amendment's due process clause. Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 325 (S.D.N.Y. 2006). "However, deprivation of property is not actionable under § 1983 if the state provides an adequate post-deprivation remedy and the deprivation was not the result of an established state practice." Wilkerson, 438 F. Supp. at 325. The "Second Circuit has held that New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates." Brooks v. Chappius, 450 F. Supp. 2d 220, 226–27 (W.D.N.Y. 2006) (citing Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996)). "New York State provides such a remedy in Section 9 of the New York Court of Claims Act, which permits an inmate . . . to pursue his claim for deprivation of property," and because Roundtree "has access to this remedy, he cannot state a claim for deprivation of property pursuant to 42 U.S.C. § 1983." Mateo v. Bristow, 2013 WL 3863865, at *6 (S.D.N.Y. July 16, 2013).

B. Strip Search

Nor do Roundtree's allegations that he was strip-searched give rise to a valid claim. The Second Circuit recognizes that inmates have a "limited right to bodily privacy," and a "strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body is a serious invasion of privacy." Harris v. Miller, 818 F.3d 49, 58 (2d Cir. 2016). Strip searches, by themselves, are considered

reasonable security measures "even when probable cause for the searches [is] absent" so long as they arise from legitimate penological or security interests.  <u>Green</u>, 224 F. Supp. 3d at 164.  But a plaintiff may establish a valid Fourth Amendment violation if he sufficiently alleges that the searches did not serve a legitimate penological purpose and instead was "designed to intimidate, harass or punish."  <u>Davila v. Messier</u>, 2014 WL 4638854, at *6 (D. Conn. Sept. 17, 2014); <u>see also</u> <u>Wilkerson</u>, 438 F. Supp. 2d at 323.

Roundtree asserts that he was harassed with "sexually invasive strip searches, at one point 5 times in 24 hours."  (Compl. ¶ 92.)  Under the Second Circuit's rubric, the alleged sexual contact must be "objectively, sufficiently serious."  <u>Boddie v. Schneider</u>, 105 F.3d 857 (2d Cir. 1997) (citing <u>Farmer</u>, 511 U.S. at 834)).  <u>Boddie</u> held that a "small number of incidents in which [plaintiff] allegedly was verbally harassed, touched, and pressed against without his consent" was objectively, sufficiently serious or "cumulatively egregious in the harm they inflicted."  105 F.3d at 861.  In contrast, Roundtree's bare assertions do not meet the "objectively, sufficiently serious" standard.  Moreover, Roundtree's allegations do not establish that these strip searches were "undertaken maliciously or for the purposes of sexually abusing an inmate," rather than "in a good-faith effort to maintain or restore discipline."  <u>Crawford v. Cuomo</u>, 796 F.3d 252, 258 (2d Cir. 2015).

C.  <u>Video Surveillance</u>

The other privacy claims asserted in the Complaint fall within the ambit of the Fourth Amendment.  This Court's review of Roundtree's claims pertaining to surveillance and biometric data is informed by the Supreme Court's recognition that a "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal

order."  Hudson, 468 U.S. at 527–28.  Roundtree principally alleges that prison officials coerced

him into submitting "individual voiceprint biometrics" and that they used hi-definition cameras

installed in various areas of the facility to "record[] and transmit[] inamges in the 15B housing

area showers, in the clinic treatment areas, and the strip search staging and search area that

double[d] as a chapel."  (Compl. ¶¶ 76, 80–81, 82.)

   But for a prisoner to allege a valid Fourth Amendment violation, he must establish

that he (1) "exhibited an actual, subjective expectation of bodily privacy," and (2) prison officials

lacked "sufficient justification to intrude on the inmate's [F]ourth [A]mendment rights."  Harris,

818 F.3d at 57.  Roundtree's claim fails with respect to both elements.  Aside from generally

alleging that he had some privacy interest, Roundtree fails to counter the simple reality of prison

life—that there is no expectation of privacy in showers, clinics, or other areas in which prison

officials routinely monitor and search prisoners.  This fact dovetails with Roundtree's failure to

satisfy the second element—that prison officials have more than a sufficient justification because

surveilling prisoners to ensure the security of the institution outweigh Roundtree's privacy

interests.  See Johnson v. Phelan, 69 F.3d 144, 147 (7th Cir. 1995) ("Cells and showers are

designed so that guards can see in, to prevent violence and other offenses.  Prisoners dress,

undress, and bathe under watchful eyes.  Guards roaming the corridors are bound to see naked

prisoners.").  And while the Fourth Amendment protects against "isolated instances of

unreasonable searches by prison officials," Roundtree has done nothing to overcome the

presumption that "overall considerations of institutional security outweigh a prisoner's claim to

privacy in particular cases."  United States v. Cohen, 796 F.2d 20, 22–23 (2d Cir. 1986).

D. Biometric Voiceprints

Roundtree's allegation that he was coerced into providing "voiceprint biometrics" fails to establish how he was harmed. He says the Department of Corrections deceived him into providing his voiceprint—which he characterizes as his intellectual property—under the guise of stopping "people from [stealing inmate phone PINs] and . . . us[ing] [their] phone calls." (ECF No. 46, at 4.) Aside from Roundtree's unsubstantiated belief that his voiceprint has been used for nefarious purposes, he fails to articulate any injury that he directly suffered. He merely seeks more information regarding the purposes of the voiceprint, and seeks to preempt a theoretical future injury by withdrawing his consent for authorities to use his voiceprint. "Although pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment, the maintenance of prison security and the preservation of institutional order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." United States v. Willoughby, 860 F.2d 15, 21 (2d Cir. 1988).

E. Drug Screening

"A drug test constitutes a search within the meaning of the Fourth Amendment and, therefore, must be conducted in a reasonable manner." Mitchell v. Dep't of Corr., 2008 WL 744041, at *9 (S.D.N.Y. Feb. 20, 2008). In prison, an inmate's "right to be free from unreasonable searches is diminished once he or she steps through the prison door [and] [i]f the intrusion into one's privacy is found to be minimal . . . and the expectation of privacy is minimal . . . and there is a governmental reason advanced supporting a search . . . then the search will not violate one's Fourth Amendment rights." Harris v. Keane, 962 F. Supp. 397, 407 (S.D.N.Y. 1997).

Roundtree says that on one occasion, prison officials without asking "in violation of HIPAA," gave him an "illegal drug screening." (Compl. ¶ 20.) The Complaint does not suggest that the drug screening was done with an intent to harass, obtusely alleging that it merely had the effect of "circumvent[ing] the law and plaintiff's constitutional rights when they did so and shared the records with any other party without first at least requesting consenting cooperation or even notifying the plaintiff the test was done." (Compl. ¶ 20.) But "as long as testing is not done with an intent to harass, a corrections officer may order an inmate to submit" to a drug test. Excell v. Woods, 2009 WL 3124424, at *27 (N.D.N.Y. Sept. 29, 2009); Rodriguez v. Coughlin, 795 F. Supp. 609 (W.D.N.Y. 1992) (two random drug tests within twelve-month period did not constitute constitutional violation). Accordingly, Roundtree's allegations concerning an illegal drug screening fail to state a claim.

IV. Municipal Liability

To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010). A plaintiff can establish an "official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised deliberate indifference to the rights of the plaintiff and others encountering those subordinates." McLennon v. City of N.Y., 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not suffice if it tenders naked assertion[s] devoid of further factual enhancement." Green v. City of Mt. Vernon, 96 F. Supp. 3d 263, 301–02 (S.D.N.Y. 2015). To defeat a motion to dismiss a municipal liability claim, the plaintiff "must allege facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists." Santos v. N.Y.C., 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

While this Court finds that Roundtree may be able to allege claims regarding inadequate bedding and seating and use of chemical spray, they do not impute liability to the City of New York. At best, they are isolated incidents that affected Roundtree. The Complaint's allegations regarding municipal liability are wholly conclusory.

Roundtree does not point to a formal policy officially endorsed by the municipality, nor does he allege that municipal officials—those imbued with decision making authority—implemented policies or took actions designed to deprive Roundtree of adequate bedding and seating or maliciously injuring him with chemical sprays.

"[I]solated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." Jones, 691 F.3d at 81. "[B]efore the actions of subordinate city employees can give rise to § 1983 liability, their [unlawful] practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992). Here, Roundtree simply attributes some of the retribution he endured to certain corrections officers. But there is no allegation suggesting that supervisors or policymakers became aware of this alleged misconduct, or that they were willfully blind to it. Warden Augustus is named as a defendant, but Roundtree makes no allegations against him.

Indeed, with respect to the inadequate bedding and seating allegations, Roundtree credits certain senior officials with assisting him: "I was fortunate a Dr. Rajan answered my request for chairs because had he not I would now probably no longer be able to walk." (ECF No. 46 at 8–9.) And but for the misconduct of some corrections officers who operated "behind Dep[uty] Robert's back to have the chairs taken away from me," the Complaint suggests that prison supervisors would not have deprived Roundtree of his seating. (ECF No. 46 at 8–9.)

Finally, there are no allegations that the City of New York failed to train its subordinates and was deliberately indifferent to the resulting misconduct. To show that the City was deliberately indifferent to the need to train its corrections officers, the Complaint must plausibly demonstrate that (1) a policymaker knew to a moral certainty that city employees will confront a particular situation; (2) the situation either presents the employee with a difficult choice of the sort of training or supervision will make less difficult or there is a history of employees mishandling the situation; and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Wray v. City of N.Y., 490 F.3d 189, 195–96 (2d Cir. 2007). Roundtree alleges nothing of the sort. Rather, the Complaint reads as though certain malfeasant actors at Rikers took it upon themselves to engage in misconduct designed to deprive Roundtree of his constitutional rights.

Accordingly, Roundtree's municipal liability claims are dismissed.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss Roundtree's Complaint is granted. All of Roundtree's claims are dismissed with prejudice except for his claims relating to: (1) deprivation of adequate bedding and seating, and (2) excessive force through the use of chemical sprays. Roundtree may re-plead only those two claims. Specifically, he must identify

the specific incidents and individuals involved in the alleged misconduct.  If Roundtree chooses to file an amended complaint, he must do so in a <u>single</u> document by May 25, 2018.

Over the past year, Roundtree has filed innumerable letters amplifying the allegations of his Complaint, raising entirely different theories of liability against the City and individuals, and generally complaining about his life in prison.  Roundtree is directed to cease and desist inundating this Court with correspondence.  Any amended complaint filed by May 25, 2018 will be the only allegations that this Court will consider.

The Clerk of Court is directed to mail a copy of this Opinion & Order to Roundtree's last known address memorialized in a letter to this Court dated February 15, 2018 (<u>see</u> ECF No. 77):

> Juel Roundtree, #17A4980
> Franklin Correctional Facility
> 62 Bare Hill Road
> P.O. Box 10
> Malone, New York 12953

The Clerk of Court is also directed to amend Roundtree's address information on the ECF docket to reflect the address listed above.  The Clerk of Court is further directed to terminate the motion pending at ECF No. 52.

Dated:  March 27, 2018  
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III  
U.S.D.J.